[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-12422
Non-Argument Calendar

_____

D.C. Docket No. 8:18-cr-00091-JDW-AAS-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ANTHONY PHILLIPS, III,
a.k.a. Twin,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 24, 2020)

Before JORDAN, NEWSOM, and ED CARNES, Circuit Judges.

PER CURIAM:

Anthony Phillips, III, appeals his 240-month total sentence after pleading guilty to two counts of carjacking and two counts of brandishing a firearm in furtherance of a carjacking.

I.

Phillips and his father committed two carjackings together in January 2018. The first one was on January 1 in Tampa, Florida. The victim, W.C., was walking to his car in an apartment complex parking lot when Phillips and his father, both of whom were armed, approached him. Phillips' father threatened W.C. at gunpoint and hit him with the butt of his rifle. Then Phillips and his father stole W.C.'s car. It was later found disassembled at a chop shop.

The second carjacking was two days later, on January 3. Phillips, his father, and two unindicted co-conspirators drove to the parking lot of a pediatrician's office in St. Petersburg, Florida. They pulled up behind a car that was occupied by S.L. and M.P. and their one-year-old daughter. Phillips and the two co-conspirators exited their car and started shouting at S.L. and M.P. Phillips pressed a gun against M.P.'s chest and ordered her to give him the keys to her car. She did. One of Phillips' co-conspirators also held a gun to S.L.'s chest. The carjackers let S.L. and M.P. pull their daughter out of the car, and then they stole the car and fled the scene. Phillips' father fled in the car that the four carjackers had arrived in.

2

The police later found Phillips and his father inside S.L. and M.P.'s car at a gas station in St. Petersburg.  They arrested both men.

A grand jury indicted Phillips for two counts of carjacking, in violation of 18 U.S.C. § 2119(1), and two counts of brandishing a firearm during a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A)(ii).  Phillips pleaded guilty to all four charges without a plea agreement.

The Presentence Investigation Report recommended, in relevant part, that the court impose a two-level enhancement under U.S.S.G. § 2B3.1(b)(4)(B) because Phillips physically restrained M.P. by pressing a gun against her chest. Phillips objected to that enhancement, arguing that he did not restrain anyone because he did not use any "forcible physical restraint."  At sentencing the district court overruled that objection and imposed a total sentence of 240 months in prison.  This is Phillips' appeal.

## II.

Phillips' lone contention on appeal is that the district court erred by applying a two-level enhancement under § 2B3.1(b)(4)(B) for restraining a victim.  We review a sentencing court's findings of fact for clear error and its application of the guidelines de novo.  United States v. Victor, 719 F.3d 1288, 1290 (11th Cir. 2013).

Section 2B3.1(b)(4)(B) states: "[I]f any person was physically restrained to facilitate commission of the offense or to facilitate escape, increase by 2 levels."

The guidelines define "physically restrained" as "the forcible restraint of the victim such as by being tied, bound, or locked up." Id. cmt. n.1; id. § 1B1.1 cmt. n.1(L). We have explained that the "use of the modifier 'such as' in the definition indicates that the illustrations of physical restraint are listed by way of example rather than limitation." United States v. Jones, 32 F.3d 1512, 1518 (11th Cir. 1994) (quotation marks omitted). As a result, any conduct that "ensured the victims' compliance and effectively prevented them from leaving" qualifies as a physical restraint under the guidelines. Id. at 1519.

The parties cite two published decisions in which we held that threatening a victim with a gun can count as physical restraint. First, in Jones the defendant and his accomplices robbed a bank and brandished guns during the robbery. 32 F.3d at 1514–15. They ordered the employees and customers into the bank's safe room, told them to lie down on the floor, and closed (but did not lock) the safe room door as they fled. Id. at 1515. We held that the victims had been "physically restrained" under the guidelines even though they were not locked in the safe room and physically could have left. Id. at 1519. We said that "the obvious presence of handguns" was enough to restrain the victims because it "ensured the victims' compliance and effectively prevented them from leaving the room for a brief period while the robbers fled the scene." Id.

4

Second, in Victor the defendant pointed a pretend gun at a bank employee and ordered her to bring him to the teller line. 719 F.3d at 1289. (In reality, the "gun" was an assault rifle magazine that the defendant was holding in his jacket pocket.) Id. We held that "by threatening the lobby employee with what the employee believed to be a gun to prevent her from escaping, [the defendant] physically restrained her within the guidelines' meaning." Id. at 1290.

Under the logic of Jones and Victor, Phillips physically restrained M.P. within the meaning of § 2B3.1(b)(4)(B) by pressing a gun against her chest and ordering her to hand over her car keys. In that moment M.P. was restrained just as surely as if her hands had been tied — she could not leave for fear of being shot in the chest by Phillips. By threatening her with a gun, Phillips "ensured [M.P.'s] compliance and effectively prevented [her] from leaving." Jones, 32 F.3d at 1519.

Phillips argues that Jones and Victor are distinguishable because they involved "forcible physical restraint" while his crime did not. But there is no meaningful difference between his conduct and the conduct in those two cases. Phillips' own brief shows why this case is like Jones and Victor: he says that those cases "illustrate physical restraint such that the victim has no alternative but compliance," and he admits that M.P. "likely felt as though she had no alternative but to comply" with his commands. We agree with that.

5

Finally, Phillips argues that "[i]f [his conduct] rose to the level of physical restraint, every threat of violence with the apparent ability to carry it out would qualify for this enhancement." Not necessarily so. The question is whether the threat of violence "ensured the victims' compliance and effectively prevented them from leaving." Jones, 32 F.3d at 1519. Here, Phillips' threat to shoot M.P. in the chest had that effect.

**AFFIRMED**.